NIEMEYER, Circuit Judge:
The issue in this appeal is whether the district court abused its discretion in declining to grant preliminary injunctive relief under § 10(j) of the National Labor Relations Act as requested to preserve the ability of the National Labor Relations Board ("the Board") to award relief after the completion of the ongoing agency process adjudicating unfair labor practice charges against two hospitals. We conclude that the Board failed to demonstrate sufficiently that the effectiveness of its remedial *435 power was in jeopardy in this case and therefore that the district court did not abuse its discretion in denying the Board's petitions for injunctive relief.
I
Bluefield Regional Medical Center is an acute-care hospital located in Bluefield, West Virginia, that employs 170 registered nurses. Greenbrier Valley Medical Center likewise is an acute-care hospital located in Ronceverte, West Virginia, that employs 120 registered nurses. These hospitals are affiliated with Community Health Systems, Inc., which has a national network of affiliated hospitals.
In August 2012, the registered nurses at both hospitals voted to be represented for purposes of collective bargaining by the National Nurses Organization Committee ("the Union"), and thereafter the Board certified the Union as the exclusive bargaining representative for each hospital's "full-time, regular part-time, and per diem Registered Nurses." Both hospitals challenged the certifications and refused to bargain with the Union, prompting the Union to file unfair labor practice charges with the Board under § 8 of the National Labor Relations Act ("the NLRA"). In December 2014, the Board issued a consolidated order directing the hospitals to recognize and bargain with the Union.
Bluefield began bargaining sessions with the Union in March 2015, and sessions continued into November 2015. At a November session, Bluefield presented the Union with a "package proposal" that lacked a grievance-arbitration provision and contained a broad management-rights clause that, among other things, reserved the hospital's right to unilaterally discharge, suspend, or discipline any registered nurse. Michelle Mahon, the Union's bargaining representative, rejected the package as "completely unacceptable" and "demonstrative of bad faith bargaining." But, according to Mahon, she nonetheless "made it clear" that the Union still wanted "to bargain in good faith," and she proposed several alternative provisions. The hospital's bargaining representative, however, stated that Bluefield was "standing with its proposal" and would not respond to the Union's proposals because the Union had not responded to its package proposal as a whole. Negotiations thereafter broke down.
Similarly, Greenbrier Valley began bargaining sessions with the Union in February 2015, and sessions continued into October 2015, when Greenbrier Valley presented a package proposal to the Union that was essentially the same as the one presented by Bluefield. And similarly, that proposal led to a breakdown in negotiations.
In addition, after Greenbrier Valley terminated a registered nurse's employment during the summer of 2015 on the ground that she had violated the hospital's attendance policy, the Union requested to bargain over the nurse's discharge and also requested that the hospital provide the Union with the nurse's attendance records and the attendance records for other nurses in her department. Greenbrier Valley stated that it was willing to bargain with the Union over the nurse's discharge and to provide the requested information but only if the Union first provided the hospital with "a suitable indemnification." Greenbrier Valley explained that, earlier in the year, an Ohio jury had returned an $800,000 verdict against Affinity Medical Center, another Community Health Systems hospital, on an employee's defamation claim, which, according to Greenbrier Valley, arose "in material part ... out of Affinity's inclusion of a [Union] representative ... in an investigatory interview." Nonetheless, the Union, emphasizing that *436 "defamation is an intentional tort," rejected the request for an indemnification agreement, calling it "absurd" and the "latest assault on the fundamental ... rights of Registered Nurses."
In January 2016, the Union filed unfair labor practice charges with the Board against both Bluefield and Greenbrier Valley under § 8(a)(1) and (5) of the NLRA, alleging that both hospitals had "unlawfully engag[ed] in surface bargaining" and had therefore "failed and refused to bargain collectively and in good faith with the [Union]." In addition, the Union charged Greenbrier Valley with bad-faith bargaining with respect to the nurse's discharge. Based on these charges, the Board issued an administrative complaint against the hospitals on March 10, 2016, commencing a process of agency adjudication that remains ongoing.
Then, roughly six months after the Union filed its charges with the Board, the Board filed petitions in the district court - one against each hospital - under § 10(j) of the NLRA, 29 U.S.C. § 160(j), requesting preliminary injunctions "pending the final disposition of [the] matters involved herein pending before the Board" that would direct the hospitals to bargain with the Union in good faith; require the hospitals to post copies of the court's preliminary injunction; and require the hospitals to read the preliminary injunction orally to the employees. The Board alleged that unless the injunctions issued, the registered nurses would be deprived "of their fundamental right to be represented for the purposes of collective bargaining." In addition, the Board sought a preliminary injunction that would direct Greenbrier to bargain in good faith over the former nurse's discharge and to furnish the Union with the requested information.
In support of the petitions, the Board filed affidavits from Union employee Michelle Mahon and various nurses, including Bluefield Nurse Brenda Meadwell and Greenbrier Valley Nurse Michelle O'Bryan. According to Mahon and Nurse Meadwell, the hospitals' negotiator frequently yelled or screamed at the Union's bargaining-team members and once threw papers toward Mahon. They also stated that some scheduled bargaining sessions were cancelled because the hospitals refused to grant bargaining-team members time off to attend the sessions.
With respect to the effect of the stalled negotiations on the employees' perception of the Union, Nurse O'Bryan stated that "[o]ver the last six months, things have died down with the [U]nion." She added:
We've been trying to negotiate forever. A lot of people are thinking, if it is going to work, it is. If it's not, it's not. In general conversation, people might say things like, "well, the [U]nion ain't done nothing." When this has come up, I'll explain that this is going to court and that it takes awhile .... Because a lot of the nurses aren't seeing anything, they aren't really talking about the [U]nion.
She stated that she had told employees that "the Union has filed charges against the hospital about things, and now we're just waiting. You know how long courts take." She noted that there had been a lot of information passed out by the Union in earlier times, but that she had not "seen any flyers in the break room about the [U]nion in a while" and that "the [U]nion reps [used to be] more visible at the hospital." She did acknowledge that she was not aware of any anti-union effort, that the Union had continued having some meetings, and that nurses continued to wear Union buttons. Finally, Nurse O'Bryan stated that a number of nurses had "left over the last few years" and were replaced *437 by licensed practical nurses, who were not part of the bargaining unit. She herself stated that she was about to change from full-time to part-time status because "nothing stays the same, there's changes made whenever the managers want to and it is hard to work that way." She also added that she had found a better paying job that was closer to her home.
On the same subject, Nurse Meadwell noted that the Union had called a "National Day of Action" on June 1, 2016, to raise awareness regarding its activities at several Community Health Systems hospitals and that, in connection with this event, she had talked to reporters from the local TV station and newspaper. She stated that she had asked three or four other registered nurses to join her but that they had said that they did not "want to participate because they were afraid they would be fired." She acknowledged that the nurses continued to have Union meetings "occasionally" and that the Union had done outreach at the hospital by talking to nurses and handing out papers.
At a hearing on the petitions before the district court in September 2016, counsel for both the Board and the hospitals represented to the court that bargaining sessions between the Union and the hospitals had resumed.
After the parties' briefing and oral arguments, the district court denied the Board's petitions for preliminary injunctive relief, without prejudice, by an order and memorandum opinion dated September 20, 2016. In its memorandum opinion, the court noted that "§ 10(j) relief is extraordinary" and that the statutory provision "only authorizes interim injunctive relief reasonably necessary to preserve the ultimate remedial power of the Board." Henderson v. Bluefield Hosp. Co. , 208 F.Supp.3d 763, 766 (S.D. W. Va. 2016) (internal quotation marks omitted) (quoting Muffley ex rel. NLRB v. Spartan Mining Co. , 570 F.3d 534, 545 (4th Cir. 2009) ). Applying Winter v. Natural Resources Defense Council, Inc. , 555 U.S. 7, 22, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008), the court concluded that the Board failed to demonstrate, as one of the requirements necessary to obtain preliminary injunctive relief, that there was a likelihood of irreparable injury to the Board's ability to remedy the alleged unfair labor practices in the absence of an injunction, and it therefore denied the Board's petitions.
Addressing the Board's theory that preliminary injunctive relief was necessary to prevent declining employee support for the Union, the court concluded that the Board had not demonstrated that employee support for the Union was "likely to wane," pointing to record evidence showing that "several registered nurses (RNs) [had] shown consistent commitment to the Union" and also reasoning that "the assertive posture that the Union [had been] tak[ing] to represent the RNs ... , particularly by filing numerous unfair labor practice charges on the nurses' behalf, indicate[d] that the employees probably [would] not perceive the Union as weak and [would] not vote with their feet by leaving it." Henderson , 208 F.Supp.3d at 771.
Moreover, with respect to the irreparability of injury, the court found that adequate remedies would be available from the Board at the conclusion of the administrative proceedings. Rejecting the general proposition that employees suffer irreparable harm "whenever [they] could be without the nonmonetary benefits of collective bargaining while awaiting the Board's actions," Henderson , 208 F.Supp.3d at 774 (quoting McKinney ex rel. NLRB v. Southern Bakeries, LLC , 786 F.3d 1119, 1125 (8th Cir. 2015) ), the court concluded that the surface bargaining allegedly committed by the hospitals did not "raise any *438 ... extraordinary circumstances," id . While the court acknowledged that, with the passage of time, some registered nurses could retire or seek employment elsewhere, it reasoned that this did not "justify a remedy that is extraordinary since these kinds of changes exist in all manner of contentious cases." Id .
At bottom, the court recognized that the Board's remedial powers in the ongoing agency proceedings were not at risk and in need of protection by § 10(j) injunctive relief.
From the district court's order dated September 20, 2016, denying the Board's petitions for a preliminary injunction, the Board filed these appeals.
II
The Board advances three main arguments in challenging the district court's order denying its § 10(j) petitions. It argues first that the district court erred by analyzing only the irreparable-harm factor for granting a preliminary injunction; second , that "[t]he court erred in refusing to infer harm from the nature of the violations the Hospitals committed"; and third , that the court "committed clear error" in its findings rejecting any substantial erosion of employee support for the Union. We address these arguments in order.
A
While recognizing that, to obtain a § 10(j) injunction, it "must establish (1) a likelihood of success on the merits, (2) a likelihood of irreparable harm in the absence of preliminary relief, (3) that the balance of equities tips in the Board's favor, and (4) that an injunction is in the public interest," as established in Winter , the Board nonetheless contends that the district court legally erred in relying on only the irreparable harm factor. It maintains "that all four [ Winter ] factors and their impact upon one another must be considered," because, according to the Board, "it was impossible for the court to completely assess the irreparable harm without, for instance, assessing the [Board's] likelihood of success, which would have required it to examine the nature of the violations at issue." Accordingly, the Board asserts that before denying any petition for a preliminary injunction, a district court must first consider "all four equitable factors and their interrelatedness."
This argument, however, is foreclosed by our decision in Muffley and by the Supreme Court's decision in Winter .
Unless Congress specifies otherwise, when courts consider granting injunctive relief under a statute, they exercise their "traditional equitable discretion." Weinberger v. Romero-Barcelo , 456 U.S. 305, 319, 102 S.Ct. 1798, 72 L.Ed.2d 91 (1982). Applying that principle in Muffley , we held that the "traditional four-part test for equitable relief" applies to petitions under § 10(j). Muffley , 570 F.3d at 542.*
*439 The concededly applicable four-part test articulated in Winter requires that the Board demonstrate that (1) it is "likely to succeed on the merits"; (2) "irreparable harm" is "likely" "in the absence of preliminary relief"; (3) "the balance of equities tips in [its] favor"; and (4) "an injunction is in the public interest." 555 U.S. at 20, 129 S.Ct. 365. Winter made clear that each of these four factors must be satisfied to obtain preliminary injunctive relief. See id . And, even more relevant to the Board's argument here, the Court indicated that it was unnecessary to address all four factors when one or more had not been satisfied. Indeed, it concluded in the circumstances before it that "[a] proper consideration of [the balance of equities and the public interest] alone require[d] denial of the requested injunctive relief," id . at 23, 129 S.Ct. 365 (emphasis added), and it therefore did "not address the lower courts' holding that plaintiffs have also established a likelihood of success on the merits," nor did it resolve whether the plaintiffs had established irreparable injury, id . at 23-24, 129 S.Ct. 365. In light of Winter , the Board's argument that district courts must consider "all four factors and their impact upon one another" before denying preliminary injunctive relief is clearly misplaced.
The Board maintains nonetheless that, "[i]n the § 10(j) context[,] courts cannot achieve a full understanding of the relevant irreparable harms without considering the type and strength of the violation involved and the statutory rights that the violation impacts." It is true that § 10(j) requires application of the Winter factors to the statutory provision's underlying purpose - namely, "preserving the Board's remedial power pending the outcome of its administrative proceedings." Muffley , 570 F.3d at 543. But nothing in that purpose suggests that a district court must mechanically consider all four Winter factors if one is clearly absent. Moreover, just because the district court found it unnecessary to reach more than one factor, it does not follow that the court failed to consider the nature of the alleged violation and "the statutory rights that the violation impacts." Indeed, the district court's thorough opinion amply demonstrates that it was fully aware of the Board's allegations that the hospitals had bargained in bad faith, and it took the nature of the hospitals' alleged violations into account in analyzing the irreparable-harm factor, even though it did not determine whether the Board was likely to show that the violations had in fact occurred.
In sum, the district court correctly applied the Winter factors and, upon finding that one had not been satisfied, concluded that the Board could not establish the necessary criteria for preliminary injunctive relief.
B
The Board next argues that the district court erred in failing to recognize that irreparable harm is "inherent in bad-faith bargaining cases," presenting three theories as to why the court should have "inferred irreparable harm from the very nature of the violation." First , it maintains that, "[a]bsent an injunction, the Hospitals' unlawful conduct is likely to cause the Union to lose its 'prestige and legitimacy' in unit employees' eyes and appear completely ineffective." "By the time the Board issues its final order," it asserts, "the Union will no longer have the support of the employees" and will therefore "be *440 unable to bargain effectively under a Board order." Second , it claims that "the Hospitals' surface bargaining also irreparably deprives employees of the benefits of collective bargaining," including both the monetary and non-monetary benefits that employees could expect to receive under a collective-bargaining agreement if the hospitals were required to negotiate in good faith. And third , it argues that "[t]he absence of good-faith bargaining ... causes a public harm that threatens the very core purpose of the Act and is, in itself, the type of harm that § 10(j) was intended to prevent."
There is, however, a fundamental tension between the Board's theories of inherent harm and the Supreme Court's recognition that "[a] preliminary injunction is an extraordinary remedy never awarded as of right ," Winter , 555 U.S. at 24, 129 S.Ct. 365 (emphasis added), as well as our own recognition that § 10(j) relief similarly should be "extraordinary ," Muffley , 570 F.3d at 545 (emphasis added). While there may well be circumstances where the likelihood of irreparable injury can be established by the same evidence indicating that the Board is likely to prove a statutory violation, see, e.g., Bloedorn v. Francisco Foods, Inc. , 276 F.3d 270, 297-98 (7th Cir. 2001), we conclude that, as a general proposition, an employer's alleged failure to bargain in good faith with a union regarding an initial collective bargaining agreement is not the kind of violation from which likely irreparable harm can be inferred . The Board has the burden of showing "that in the absence of a preliminary injunction," the Union and the employees it seeks to represent are "likely to suffer irreparable harm before a decision on the merits can be reached," Winter , 555 U.S. at 22, 129 S.Ct. 365 (emphasis added) (internal quotation marks and citation omitted), and, in particular, that "interim injunctive relief [is] reasonably necessary to preserve" the Board's "ultimate remedial power" and will not "be a substitute for the exercise of that power ," Muffley , 570 F.3d at 545 (emphasis added) (quoting Schaub ex rel. NLRB v. Detroit Newspaper Agency , 154 F.3d 276, 279 (6th Cir. 1998) ). The Board's theories of the harm inherent in the alleged surface bargaining are not only too speculative and categorical, but they also fail to demonstrate why the Board's own relief given at the conclusion of the agency process cannot address the violations.
The Board's first theory that interim relief is necessary to prevent the Union from losing employee support may not be flawed in the abstract, but it fails in the circumstances of this case. It may well be that some employees feel frustrated by the lack of progress to date, but we cannot simply infer that, by the time the Board completes the agency process, support for the Union will have collapsed to the point where the Union would be unable to negotiate effectively under a remedial order issued by the Board. The Union and those employees who support the Union remain free to tell the registered nurses that the hospitals have been stonewalling and that the Board is pursuing legal action on the Union's behalf, as the record indeed reflects. At bottom, it is far from inevitable or even likely that persisting employee frustrations will undermine the ability of the Board to award appropriate relief. Cf. Muffley , 570 F.3d at 544 (noting, in a case where an ALJ had found that the employer had systematically refused to hire union members, that abundant evidence showed "that, without some measure of preliminary relief, many of the victims of the alleged discrimination would either retire or move away in search of other employment" and therefore concluding that, "[i]n such a situation , even a well-established union ... might well lose support over *441 time, such that when the Board does issue its order, it might be impossible for the union to reconstitute" (emphasis added) ).
The Board also contends that a preliminary injunction is warranted because "the Hospitals' violations are ... irreparably depriving employees of the benefits of collective bargaining." This theory, however, rests on the assumption that if the district court were to order the hospitals to negotiate in good faith, the hospitals and the Union would be likely to negotiate successfully an initial collective bargaining agreement before the Board resolves the administrative complaint. That is the only scenario under which an interim court order requiring the hospitals to bargain in good faith could have any impact on the ability of employees to start enjoying the fruits of a collective bargaining agreement. But the Board has given us no reason to assume that the hospitals and the Union would be likely to complete the complicated process of negotiating an initial collective bargaining agreement before the Board can enter its own final order in the underlying administrative proceedings. See McKinney , 786 F.3d at 1125 ("It would be contrary to our precedent to find irreparable harm whenever employees could be without the nonmonetary benefits of collective bargaining while awaiting the Board's action").
Finally, the Board contends that Congress has "recognized that a party's failure to bargain in good faith is a public harm" and that, "[a]s such, the absence of good-faith bargaining in and of itself constitutes a significant and, over time, irreparable harm" justifying interim relief under § 10(j). But this argument also falls wide of the mark. While Congress has assuredly decided that the public's interest is best served by requiring employers to negotiate in good faith with duly constituted unions, it does not follow that, absent § 10(j) relief, the public's interest in industrial peace is likely to be irreparably harmed during the time it takes to complete the administrative process before the Board. Indeed, Congress specifically addressed this public interest in creating that administrative process, reserving § 10(j) relief from the courts for only extraordinary circumstances.
At bottom, the Board's position amounts to an argument that whenever it has established that it is likely to succeed on the merits of a complaint alleging that an employer has engaged in bad-faith bargaining, it has necessarily established that irreparable harm is likely in the absence of a preliminary injunction. But that proves too much. Perhaps recognizing this fallacy, the Board attempts to reassure us that "recognizing [irreparable] harm [as] inherent in bad-faith bargaining cases [will] not make § 10(j) relief commonplace" because "the Board does not seek injunctive relief in the vast majority of cases." (Emphasis added). But this ignores the role that Congress has assigned to the district court in the first instance to assess whether interim relief would be "just and proper," 29 U.S.C. § 160(j), an analysis properly governed by Winter 's four factors and the recognition that preliminary injunctive relief under § 10(j) is an "extraordinary" remedy appropriate only to "preserv[e] the Board's remedial power pending the outcome of its administrative proceedings," Muffley , 570 F.3d at 543, 545.
C
Finally, the Board contends that the district court "committed clear error" in its evaluation of the record evidence, arguing that the record "show[s] a decrease in employee confidence in the Union, employee willingness to participate in Union activities, and the Union's level of employee support." The evidence, however, *442 was far from as one-sided as the Board suggests and, in any event, falls short of showing a threat to the Board's remedial power. While there was some evidence - particularly in Greenbrier Valley Nurse O'Bryan's affidavit - that some registered nurses had expressed "frustrat[ion] with the fact that it's taking so long to get a contract," there was also ample evidence demonstrating efforts by the Union's supporters to counteract that sentiment, as the district court noted. Thus, it is far from clear on the present record that, absent interim injunctive relief, employee support for the Union would likely decline to a point where the Union would be unable to negotiate effectively should the Board ultimately issue a bargaining order and afford other relief. Nurse O'Bryan also stated that "a lot of the RNs are gone" and expressed her view that the hospital was hiring non-bargaining unit licensed practical nurses to take their place in an effort to undercut the Union. But there was no evidence that registered nurses were leaving the hospital because of Greenbrier Valley's alleged surface bargaining, and so there was no reason to infer that any such trend would be reversed by a preliminary injunction directing the hospital to bargain in good faith. Nor was there evidence, aside from Nurse O'Bryan's speculation, that the hospitals were purposefully seeking to replace registered nurses with licensed practical nurses in an effort to deplete the Union's strength. See Muffley , 570 F.3d at 538, 544-45 (noting "abundant evidence" of discriminatory hiring by an employer in order to prevent unionization and then affirming both the district court's grant of injunctive relief ordering the employer to hire union members and its denial of an injunction directing the employer to recognize and bargain with the union).
In short, we conclude that the district court did not clearly err in making its factual findings and that it appropriately evaluated the record in concluding that the Board had failed to show that irreparable harm was likely without a preliminary injunction.
III
While the Board appropriately recognizes that § 10(j) authorizes preliminary injunctions for the purpose of preserving the Board's remedial power pending the outcome of its administrative proceedings, its arguments for injunctive relief fail to demonstrate that the Board's ability to redress the alleged unfair labor practices will be impaired or frustrated.
The NLRA "empower[s]" the Board "to prevent any person from engaging in any unfair labor practice ... affecting commerce." 29 U.S.C. § 160(a). And, to that end, the Act authorizes the Board to receive charges of unfair labor practices and, in response, to issue complaints against the alleged offending parties. Id . § 160(b). The Act authorizes the Board to receive evidence, to render opinions on such charges, and, if violations are found, to issue an order "requiring such person to cease and desist from such unfair labor practice, and to take such affirmative action including reinstatement of employees with or without back pay, as will effectuate the policies of this subchapter." Id . § 160(c).
In this case, the Union has filed charges with the Board that the hospitals have been and are engaging in unfair labor practices, and the agency process is now ongoing before the Board. Nothing that the Board has presented in this case shows that its ability to remedy the hospitals' alleged violations is at risk of being rendered ineffective. We thus conclude that the district court, after carefully reviewing the alleged need for interim relief, did not *443 abuse its discretion in denying it. Accordingly, we affirm.
AFFIRMED

While Muffley applied the traditional four-part test for preliminary injunctive relief articulated in Blackwelder Furniture Co. of Statesville, Inc. v. Seilig Manufacturing Co. , 550 F.2d 189 (4th Cir. 1977), which balanced various factors and, in certain circumstances, allowed a preliminary injunction to issue based on a showing of "a 'possible ' irreparable injury," id . at 196 (emphasis added), the Supreme Court in Winter held that a "possibility of irreparable injury" factor was "too lenient" for preliminary equitable relief, 555 U.S. at 22, 129 S.Ct. 365, thus abrogating the Blackwelder test. Instead, Winter requires a likelihood of irreparable injury, a higher standard. Id . at 21, 129 S.Ct. 365 ; see also Real Truth About Obama, Inc. v. FEC , 575 F.3d 342, 346-47 (4th Cir. 2009) (recognizing that "[o]ur Blackwelder standard ... stands in fatal tension with the Supreme Court's 2008 decision in Winter "), vacated and remanded on other grounds , 559 U.S. 1089, 130 S.Ct. 2371, 176 L.Ed.2d 764 (2010), reinstated in relevant part , 607 F.3d 355 (4th Cir. 2010) (per curiam).